**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**CaroleLynn Hurd,**
**a.k.a. CaroleLynn Gabert**

     **v.**                          Civil No. 07-cv-216-PB
                                        Document No. 2008 DNH 044__

**Commissioner, Social**
**Security Administration**

**MEMORANDUM AND ORDER**

Plaintiff CaroleLynn Hurd moves to reverse the Social Security Administration's denial of her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423.  Hurd applied for both DIB and Supplemental Security Income ("SSI") in December 2001, alleging disability as the result of rheumatoid arthritis, fibromyalgia, osteoporosis, chronic back pain, and acid reflux.  In a separate proceeding, the Commissioner awarded Hurd SSI, finding that she met Listing of Impairment § 14.09 for inflammatory arthritis as of December 1, 2001.  In the DIB proceeding under review in this case, the Commissioner denied Hurd's application, finding that she did not meet a listing of impairment prior to June 30, 2000, Hurd's date last insured for DIB purposes.  Hurd now seeks reversal of the

Commissioner's final decision on her application, issued by the Appeals Council (the "Council") on June 4, 2007.  The Commissioner, in turn, moves to affirm.  For the reasons that follow, I grant Hurd's motion to reverse, deny the Commissioner's motion to affirm, and remand this case to the Social Security Administration for further proceedings.

## I.   BACKGROUND[1]

### A.   Procedural History

Hurd applied for DIB on December 21, 2001, when she was fifty-three years old, alleging onset of her disability on May 15, 1999.  Tr. 108-10.  Hurd's date last insured, for purposes of calculating DIB, was June 30, 2000.[2]

A person is disabled within the meaning of the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical

---

[1] Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts (Doc. No. 11) submitted by the parties.  Citations to the Administrative Transcript are indicated as "Tr.".

[2] Under the Social Security Act, in order to be eligible for disability insurance benefits, Hurd must demonstrate that she was disabled on or prior to her date last insured.  See 42 U.S.C. § 423(c).

or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(a).  The Social Security Administration ("SSA") found that Hurd was not disabled and initially denied her claim on June 26, 2002.  Tr. at 83-86. Hurd requested a hearing by an Administrative Law Judge ("ALJ"); the hearing was held on January 28, 2003, before ALJ Robert Klingebiel.  Tr. at 27-81.  Hurd and a Vocational Expert ("VE"), Cynthia Ward, provided testimony, and Hurd was represented by counsel.  Id.

In a written decision dated April 25, 2003, the ALJ concluded that Hurd was not disabled.  See Tr. at 16-26; see also 42 U.S.C. § 416(i)(1)(a).  Pursuant to 20 C.F.R. § 404.1520, the ALJ used a five-step process to make this finding, considering:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a specific impairment listed in the SSA regulations and meets the duration requirement; (4) assessment of residual functioning capacity ("RFC") and whether the claimant can still do past relevant work; and (5) assessment of claimant's RFC, age, education, and work experience, to see if claimant can make

-3-

an adjustment to other work.[3]   See 20 C.F.R. § 404.1520.  If, at

step three in this analysis, the claimant is found to meet a

"Listing of Impairment" in the social security regulations at 20

C.F.R., Part 404, Subpart P, Appendix 1, the claimant is disabled

and the analysis does not continue.   Id.

     The ALJ concluded that Hurd had not engaged in substantial

gainful activity after her alleged onset date of May 15, 1999, and

that she had the severe impairment of rheumatoid arthritis.   Tr.

at 21-22.   The ALJ found that Hurd's impairment did not meet the

criteria of Listing of Impairment § 14.09[4] because the record did

not support a finding that her impairment resulted in an inability

to ambulate or to perform fine and gross movements effectively, as

_____

[3] The claimant has the burden of proof for the first four
steps of this process.   Freeman v. Barnhart, 274 F.3d 606, 608
(1st Cir. 2001).   If the claimant meets her burden of proof at
the first four steps, the burden shifts to the Commissioner, who
must come forward with evidence of specific jobs in the national
economy that the claimant can still perform despite her
impairment.   Id.

[4] In order to meet Listing of Impairment § 14.09 for
Inflammatory Arthritis, Hurd would need to show:  "History of
joint pain, swelling, and tenderness, and signs on current
physical examination of joint inflammation or deformity in two or
more major joints resulting in inability to ambulate effectively
or inability to perform fine and gross movements effectively, as
defined in 14.00B6b and 1.00B2b and B2c."   There are other ways
for a claimant to meet this listing, but they are not relevant in
this case.

required by the listing's criteria.  Tr. at 22.  Moving on to step
four of the analysis, the ALJ found that Hurd had the residual
functional capacity ("RFC") to perform a reduced range of light
work, with the ability to lift a maximum of 20 pounds occasionally
and 10 pounds frequently, and with the non-exertional limitations
that she could not reach overhead or perform significant fine
finger activity with her right (dominant) upper extremity.  Tr. at
24.  The ALJ ultimately determined that Hurd was not disabled
because she retained the ability to perform her past relevant work
as an office aide, despite suffering from rheumatoid arthritis.
Tr. at 16-26.  The Appeals Council denied Hurd's request for
review on August 25, 2003.  Tr. at 7-11.

     Hurd then filed for review of the Commissioner's decision in
this court pursuant to 42 U.S.C. § 405(g).  On October 1, 2004,
Judge DiClerico remanded the case to the SSA because the ALJ
considered only Hurd's rheumatoid arthritis and failed to
expressly consider all of Hurd's impairments, which also included
fibromyalgia and fibrositis.  Gabert v. Barnhart, Case No. 03-cv-
406-JD, order dated Oct. 1, 2004 (reproduced at Tr. at 380-82).
The Council vacated the ALJ's previous decision on November 16,
2004, and remanded the case for further ALJ review.  Tr. at 383-

84.  The Council noted that the Commissioner had determined in Hurd's SSI proceeding that she was disabled as of December 1, 2001.  Accordingly, the Council advised the ALJ that he "may wish to obtain the testimony of a medical expert" to address the issue of onset of Hurd's disability prior to December 1, 2001.  <u>Id.</u>

Hurd appeared at a second hearing before ALJ Klingebiel on April 15, 2005.  <u>Tr.</u> at 474-516.  Hurd and the VE, Cynthia Ward, again offered testimony before the ALJ, and counsel again represented Hurd and participated in the hearing.  The ALJ had scheduled a medical expert to appear at the hearing as well, but he announced at the hearing that he had cancelled the appearance of the medical expert, stating that he would decide whether to have the expert's input into the case depending on what unfolded at the hearing.  <u>Tr.</u> at 477-78.  In a written decision dated November 18, 2005, the ALJ again found that Hurd's impairments, considered singly and in combination, did not meet a listing of impairment because she was fully weight-bearing with only moderate degenerative changes in her right shoulder.  <u>Tr.</u> at 376.  At step four, the ALJ again found that Hurd retained the RFC to return to her past relevant work as an office clerk and was therefore not disabled.  <u>Tr.</u> at 370-79.

Hurd sought review of the ALJ's decision before the Appeals Council.  The Council accepted the case for review and issued its decision on June 4, 2007.  <u>Tr.</u> at 359-66; 466-67.  The Council agreed with the ALJ's findings at steps one, two, and three of the disability analysis.  <u>Tr.</u> at 363.  With respect to the ALJ's determination that Hurd did not meet the requirements for any listed impairment, the Council noted that the Commissioner had previously determined in the SSI proceeding that Hurd suffered from a listed impairment as of December 1, 2001.  Further, although the Council appeared to disagree with the Commissioner's decision on this point, it recognized that the decision was final because the time for challenging it had passed.  Nevertheless, the Council left intact the ALJ's determination that Hurd did not meet the requirements established for any listed impairment as of June 30, 2000, her date last insured for purposes of DIB.   The Council also agreed with the ALJ's determination of Hurd's RFC, but found at step four that Hurd's previous job as an office aide did not qualify as "past relevant work."  <u>Tr.</u> at 364.  The Council nevertheless denied Hurd's application because it found at step five that there were a significant number of jobs in the national economy that Hurd could perform, given her RFC.  <u>Id.</u>  This June 4,

2007 decision of the Appeals Council is the Commissioner's final decision on this case, subject to review in this court pursuant to 42 U.S.C. § 405(g).

**B.   Medical History**

Hurd was 52 years old when her insured status expired on June 30, 2000.  Tr. at 36.  She is a high school graduate and attended one year of college that led to a secretarial certificate.  Id. She has worked in a variety of jobs, including as an office assistant, assembler of electronic products, data entry worker, assembler of medical products, and greenhouse worker.  Tr. at 38, 41, 45, 51.  The administrative record in this case contains detailed medical records from 1989 to 2004.

**1.   Records Prior to Alleged Onset Date (prior to May 15, 1999)**

In 1989, Hurd saw Dr. Stromquist several times for persistent muscle pain in her back, but the doctor made no definite diagnosis beyond a finding of mild scoliosis and possible fusion at one joint.  Tr. at 290, 292, 294.  The doctor noted that the pain could be from fibrositis, but he found no tender points to confirm this.  Tr. at 291.  The doctor prescribed physical therapy and Motrin for pain.  Tr. at 291.  In June 1989, Dr. Stromquist noted that Hurd was feeling better and had been active doing camping,

hiking, and fishing.  Tr. at 293.

In July 1989, Hurd saw Dr. Sole for another opinion regarding her back.  Dr. Sole noted that the x-rays showed no evidence of degenerative joint disease but did show mild scoliosis.  Tr. at 294-95.  She noted that Hurd reported more pain on her right side than her left, as well as pain radiating into her right shoulder.  Tr. at 294.  Dr. Sole prescribed Naprosyn and gave Hurd a heel pad to offset the discrepancy between the lengths of her legs.  Tr. at 295.  In August 1989, Dr. Sole noted tenderness in Hurd's right shoulder area and diagnosed possible synovitis of the right SI joint with no true arthritis.  Tr. at 296.  Dr. Sole noted improvements in September and October 1989 and continued to prescribe Naprosyn and physical therapy.  Tr. at 298.

In August 1993, Hurd saw her primary care physician, Dr. Degnan, reporting a one-year history of intermittent joint swelling and discomfort in her shoulders, elbows, wrists, knees and ankles.  Tr. at 173.  Dr. Degnan made a presumptive diagnosis of rheumatoid arthritis based on a positive rheumatoid factor titer "despite minimal evidence of joint swelling or deformity."  Tr. at 175.  Hurd began taking Toradol tablets for pain.  Id.

Hurd saw Dr. Passas, a rheumatologist, in October 1993.  Tr. at 196.  Hurd reported swelling in her ankles, knees, and feet, and pain in her hips, elbows, shoulders, and hands.  Tr. at 198. Dr. Passas diagnosed rheumatoid arthritis, fibrositis, active synovitis of mild degree in the hands, and mild scoliosis.  Tr. at 197.  Dr. Passas concluded that the rheumatoid arthritis diagnosis did not fully explain Hurd's complaints of skeletal pain, noting stress and fibrositis as contributing factors.  Id.  Dr. Passas prescribed Elavil, Plaquenil, and physical therapy.  Id.

Hurd returned to Dr. Passas in November 1993, reporting feeling a little better overall but having difficulty affording her medication.  Tr. at 202.  The doctor again diagnosed fibrositis and rheumatoid arthritis and prescribed Plaquenil, Naprosyn, and Elavil.  Id.  In January 1993, Dr. Passas reported that, clinically, Hurd appeared at least 50% better.  Tr. at 203.

Hurd saw Dr. Degnan in April 1994 and reported stress, knee pain, insomnia, acid reflux, and depression.  Tr. at 181.  The doctor diagnosed rheumatoid arthritis, depression, probable patellofemoral syndrome, and possible mild acid reflux.  Id.

On April 20, 1994, Dr. Passas wrote to Dr. Degnan that Hurd showed no signs of synovitis and stated that Hurd may never have

-10-

shown clear-cut signs of synovitis despite the mildly positive rheumatoid factor.  Tr. at 205.  Dr. Passas noted that the only consistent findings regarding Hurd were stress, insomnia, and "profound, constant musculoskeletal complaints whose only findings objectively are compatible with fibrositis with multiple trigger and tender points."  Id.  Dr. Passas scheduled no follow-up appointments, discontinued Plaquenil, and stated that Hurd "is going to have to become more actively involved in attempts to extricate herself from the profound stress, and begin more actively to seek some appropriate therapy."  Id.

In June 1994, Hurd saw Dr. Degnan and reported that aquatic physical therapy was working, but that getting in and out of the pool was difficult and that she was afraid of water and unable to relax.  Tr. at 184.  Hurd returned to Dr. Degnan in September 1994 for review of her arthritic joints, particularly focusing on pain in her left wrist and swelling in her knees and ankles.  Tr. at 184.  Dr. Degnan diagnosed depression, rheumatoid arthritis, fibrositis, and chronic pain, and urged Hurd to continue taking Zoloft for depression.  Tr. at 185.

Hurd saw Dr. Degnan again in February 1995.  Tr. at 186.  She reported continuing diffuse musculoskeletal pain and difficulty

staying on her medications because of financial problems.  Id.
Dr. Degnan observed no obvious joint deformity or swelling, but he
did observe muscular tightness with palpable trigger points and
spasm.  Id.  He diagnosed fibromyalgia/fibrositis, stress,
anxiety, depression, and urticaria (hives).  Id.  Hurd contacted
Dr. Degnan's office in April, August, and November 1995 about her
various medications.  Tr. at 187.

Dr. Degnan saw Hurd again in May 1997.  Tr. at 188.  He noted
that she had been without medication for many months, and that she
reported chronic discomfort in her head, neck, shoulders, arms,
and hands, as well as heartburn and insomnia.  Id.  Dr. Degnan
diagnosed Hurd with fibrositis, fibromyalgia, and possible
rheumatoid arthritis.  Id.  He recommended that Hurd restart
taking her medications Oruvail and Zoloft, he and gave her some
samples of Prilosec.  Id.

In July 1997, Hurd consulted her doctor's office reporting
muscle spasms in her back.  Tr. at 190.  Hurd reported to the
examiner that she had a long history of back problems, although
the examiner noted that he couldn't find anything specifically
wrong with her back.  Id.  The examiner prescribed a muscle
relaxant and recommended considering physical therapy.  Id.

-12-

Hurd saw Dr. Degnan in January 1998; at that visit he noted mild hypertrophy in her finger joints and tenderness in her wrists, knees, and ankles.  Tr. at 192.  He diagnosed fibrositis, rheumatoid arthritis, and dysthymia.  Id.

### 2.   Records From Alleged Onset Date to Date Last Insured (May 15, 1999 - June 30, 2000)

In 1999, Hurd began to see Dr. Walczak as her primary care physician.  In August 1999, Dr. Walczak noted a history of rheumatoid arthritis, fibromyalgia, depression, and acid reflux. Tr. at 218.  Hurd reported generalized pain, especially joint pain, and occasional ankle swelling.  Tr. at 219.  Dr. Walczak observed no obvious swelling or deformity of joints, but he noted a significant decreased range of motion in the right shoulder. Id.

Hurd returned to Dr. Walczak in February 2000 for complaints of shoulder pain.  Tr. at 223.  The doctor noted that Hurd's right shoulder was tender to palpation and that her range of motion was reduced such that she "can barely elevate the right arm."  Id.  He ordered x-rays, which showed diffuse osteoporosis and a questionable deformity of the humeral head that suggested chronic dislocation and possible narrowing of the shoulder joint, but no other abnormalities.  Tr. at 225.

Hurd saw Dr. Piscopo, an orthopedist, in May 2000 reporting pain and stiffness in her right shoulder area.  Tr. at 232.  X-rays showed moderate degenerative arthritis in her right shoulder, and Dr. Piscopo noted a reduced range of motion in Hurd's right shoulder.  Id.  He advised Hurd of treatment options, including cortisone or Hyalgan injections, physical therapy, subacromial decompression, or possible joint replacement.  Tr. at 233.

### 3.   Records After Date Last Insured (June 30, 2000 - November 2004)

In October 2000, Hurd was involved in a car accident and went to the emergency room reporting neck and back pain.  Tr. at 236-40.  Cervical x-rays showed no fracture, dislocation, or bony destruction.  Tr. at 241.

Hurd saw Dr. Walczak for a follow-up later in October 2000.  Tr. at 226.  The doctor made no notations of joint pain, but he did diagnose Hurd with hives, dyschiria, acid reflux, and anemia.  Id.  Hurd saw Dr. Walczak in April 2001 reporting joint pain from rheumatoid arthritis and fibromyalgia, and some shortness of breath and chest pain during physical activity.  Tr. at 227.

In November 2001, Hurd began seeing Dr. Yost, a rheumatologist.  Tr. at 250.  Hurd's chief complaint was painful limitation in motion of her right shoulder, and she also reported

stiffness in her joints and weight-bearing pain in her knees and feet.  Id.  Dr. Yost diagnosed symmetric inflammatory polyarthritis with advanced synovitis in the wrists and no subtle changes at the feet, hands, and ankles.  Tr. at 251.  The doctor noted that Hurd had limited motion in her right shoulder with radiographic rheumatoid erosion.  Id.  He prescribed methotrexate. Id.

From 2002 to 2004, Hurd continued to see Dr. Yost for her rheumatoid arthritis and fibromyalgia and Dr. Walczak for routine physicals, follow-ups, and other health problems including headaches, allergies, acid reflux, depression, hemorrhoids, and anemia.  See Tr. at 254, 301-07, 318-19, 333, 433-38, 441-43, and 459-60.

`In December 2002, Hurd was examined by Dr. Windier, who filled out a form on her behalf in connection with a Medicaid application.  Tr. at 322-23.  Dr. Windier observed that Hurd had a severely reduced range of motion in her right shoulder and wrists, a moderately reduced range of motion in her hips, and slight to moderate decreased flexion in her knees, with weak grips and tenderness in her elbows and fingers.  Id.  He also noted problems with mood swings, acid reflux, and allergies.  Id.

-15-

From 2002 to 2004, Dr. Yost noted that Hurd showed improvement in her joint swelling and stiffness when she was taking the appropriate medications, but that, due to financial considerations, Hurd did not always take the prescribed medications at their recommended dosage.  See, e.g., Tr. at 301. Dr. Yost's medical records show that he worked with Hurd to help her obtain the appropriate treatment, switching her medication from pill form to injection form at one point (Tr. at 307) and helping her obtain medication through a needy assistance program (Tr. at 301).  The records consistently demonstrate that Hurd's symptoms improved when she was able to take all prescribed medications and worsened when she had trouble obtaining her medications.  See Tr. at 303, 433, 436.

### 4.   Assessments and Reports in Connection with DIB Application

Hurd applied for disability insurance benefits in December 2001.  Tr. at 108-10.  She submitted an "Activities of Daily Living" report in January 2002.  Tr. at 137-42.  In this report, she described problems sleeping due to pain and difficulties using her right arm and putting weight on her wrists.  Tr. at 137.  She described difficulty concentrating and pain from standing or sitting for too long due to stiffening of joints.  Tr. at 139.

-16-

Despite these limitations, Hurd reported that she was able to do some household chores, drive occasionally, and do simple cooking and shopping tasks. <u>Tr.</u> at 137-38.

On June 13, 2002, Dr. Hugh Fairley conducted a full review of Hurd's medical records in order to complete a physical RFC assessment. <u>Tr.</u> at 261-68. Dr. Fairley concluded that during the relevant period of time (May 1999 through June 2000), there was no evidence of active synovitis or joint deformity except in Hurd's right shoulder. <u>Tr.</u> at 268. Despite this significant impairment, he concluded that Hurd retained the capacity to do light work with restrictions of lifting no more than 20 pounds occasionally, no more than 10 pounds frequently, and avoiding any right upper extremity above-shoulder-level reaching. <u>Id.</u> Because the Activities of Daily Living report completed by Hurd was done in January 2002, Fairley concluded that it was not relevant to his conclusion because the focus, for DIB purposes, was on the time period from May 1999 to June 2000. <u>Tr.</u> at 267.

On June 26, 2002, at the request of the New Hampshire Department of Health and Human Services, Rachel Heath, a Physical Therapist at Concord Hospital, conducted a Functional Capacity Evaluation of Hurd. <u>Tr.</u> at 271-89. This evaluation involved

extensive in-person testing and examination of Hurd and it tested her grip strength, fitness, lifting abilities, material handling abilities, and physical effort.  Id.  It also tested Hurd's subjective understanding of her own tolerances and measured her self-perception of her own limitations.  Tr. at 286-88.  Heath concluded that Hurd provided near full physical effort during testing and that it would be safest to place Hurd in a light capacity part-time job, four hours per day and five days per week. Tr. at 273.  Heath recommended positional changes every 30 minutes, avoidance of repetitive motions with the left wrist and the right shoulder, avoidance of bending beyond half range, and frequent rest periods.  Id.  She noted that Hurd's subjective understanding of her limitations "matches poorly with actual tolerances."  Id.  For example, Hurd thought that she could lift a maximum of five pounds occasionally, while testing demonstrated that she could lift twenty pounds occasionally.  Id.

In August 2002, Dr. Yost filled out an Arthritis RFC Questionnaire on Hurd's behalf.  Tr. at 256.  He opined that Hurd's pain would constantly interfere with her attention and concentration, that Hurd had a severe limitation in her ability to deal with work stress, that she could walk less than one-half of a

city block without rest or severe pain, and that Hurd could sit
for a maximum of one hour at a time and stand for a maximum of 20
minutes at a time during an average workday.  Tr. at 256-58.  Dr.
Yost wrote that, in a normal work day, Hurd could stand or walk
for a total of less than two hours per day and sit for about four
hours per day, with the need to shift positions at will and take
unscheduled breaks during the day.  Tr. at 258-59.  He also opined
that she could occasionally lift less than 10 pounds and could
never lift more than 20 pounds, with significant limitations as to
repetitive reaching, handling, or fingering, such that she could
only engage in those activities for 10-20% of the day.  Tr. at
259.

## II.   <u>STANDARD OF REVIEW</u>

I am authorized pursuant to 42 U.S.C. § 405(g) to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the Commissioner's final decision.  My review is
limited to whether the Commissioner (through the ALJ and the
Council) applied the proper legal standards and found facts based
upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec.,

211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The Commissioner's findings of fact are accorded deference as long as they are supported by substantial evidence. Ward, 211 F.3d at 655. I must uphold these factual findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). The Commissioner's factual findings are conclusive if there is substantial evidence to support his or her decision, even if the record "arguably could support a different conclusion." Id. at 770. The findings are not conclusive, however, when they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35.

The Commissioner is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769. It is the role of the Commissioner, not the role of this court, to resolve conflicts in the evidence. Id.

### III.  **ANALYSIS**

Hurd raises several arguments in support her motion for reversal.  I need not address each of her arguments, however, because I find that the ALJ's failure to call a medical expert at Hurd's second administrative hearing on April 15, 2005, and the Council's misplaced reliance on the VE's testimony from Hurd's first administrative hearing in its June 4, 2007 order each independently constitute error requiring remand.

In Hurd's separate SSI proceeding, the Commissioner found that Hurd was disabled as of December 1, 2001, because she met the requirements of Listing of Impairment § 14.09, which covers inflammatory arthritis.  This determination is binding on the Commissioner in this proceeding.  See 20 C.F.R. § 404.950(f).[5]

---

[5] Section 404.950(f) authorizes an ALJ to refuse to accept a factual finding from a prior proceeding conducted under a different title where "there are reasons to believe that it was wrong."  Although the Council apparently did not agree with the prior determination in the SSI proceeding that Hurd met the requirements for a listed impairment as of December 1, 2001, it noted that the determination was final in the SSI proceeding and it did not cite § 404.950(f) in its analysis.  Moreover, the Commissioner does not invoke § 404.950(f) in its brief before this court.  Accordingly, I do not consider whether § 404.950(f) entitled the Council to disregard the Commissioner's determination in the SSI proceeding that Hurd met the requirements for a listed impairment as of December 1, 2001.

Thus, the principal issue in this case is whether the onset date of Hurd's recognized disability was before or after June 30, 2000, Hurd's date last insured.  If she only became disabled after June 30, 2000, she is not eligible for DIB.  If she was disabled prior to June 30, 2000, she is eligible for DIB.

Determining the onset date of a disabling impairment is a complex issue that generally should be made after consulting medical experts.  Social Security ruling 83-20 provides that "At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred."  SSR 83-20.  The Council, when it originally remanded Hurd's case for a second administrative hearing, recognized that the ALJ may wish to consult an expert to address the issue of Hurd's onset date.  Tr. at 383.  Although neither the regulations nor the Council explicitly directed the ALJ to consult a medical expert, the circumstances of the case required him to obtain expert advice. This case involves a chronic inflammatory disease that progresses over time, and the evidence in the medical record is equivocal on the issue of Hurd's onset date.  Therefore, the ALJ should have consulted a medical expert at Hurd's second administrative hearing.  See, e.g., Karlix v. Barnhart, 457 F.3d 742, 747 (8th

Cir. 2006); Armstrong v. Comm'r of the Soc. Sec. Admin., 160 F.3d 587, 589 (9th Cir. 1998).

The Commissioner's decision is also subject to reversal on the alternative ground that the Council mistakenly based its step five determination on testimony provided by a VE at Hurd's first administrative hearing.  In its opinion, the Council stated that Hurd could perform the jobs of information clerk, receptionist, file clerk, return item clerk, or hand packager (such as work as a packing line worker or dental floss packer).  Tr. at 365.  These jobs were examples provided by the VE at Hurd's first administrative hearing, and the VE's testimony regarding these jobs is not reliable because the VE named the listed jobs at Hurd's first hearing in response to a hypothetical that did not accurately reflect Hurd's limitations.  See Tr. at 71-75; see Arocho v. Sec. of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) (holding that for a VE's testimony to be reliable, the hypothetical questions given to the VE must "correspond to conclusions that are supported by the outputs from the medical authorities.").  When the hypothetical was modified at the second hearing to more accurately reflect Hurd's RFC, the VE's response differed materially from his response at the first hearing.  Under

-23-

these circumstances, the Council erred in basing its step five

determination on testimony supplied by the VE at the first

hearing.

### IV.   CONCLUSION

For the reasons discussed above, I grant Plaintiff's motion

to reverse (Doc. No. 8), deny the Commissioner's motion to affirm

(Doc. No. 10), and remand this case to the Social Security

Administration.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


February 25, 2008

cc:  Raymond Kelly, Esq.
     Robert Rabuck, AUSA


-24-